971 F.2d 642
 Prod.Liab.Rep. (CCH) P 13,293
Dannie Lee GEAN, Mary Ann Gean, Plaintiffs-Appellants,
v.
CLING SURFACE COMPANY, Defendant,
FMC Corporation, Defendant-Appellee,
Uniroyal, Inc., Defendant,
National Union Fire Insurance Co., Defendant-Intervenor.
 No. 91-7098.
 United States Court of Appeals,
Eleventh Circuit.
 Sept. 3, 1992.
Rehearing and Rehearing En Banc
Denied Oct. 2, 1992.
 
 Steven D. Tipler, Birmingham, Ala., Robert J. Binstock, Dennis C. Reich, Reich & Binstock, Gregg M. Rosenberg, Gregg M. Rosenberg & Associates, Houston, Tex., for plaintiffs-appellants.
 Hobart A. McWhorter, Jr., John E. Goodman, Bradley, Arant, Rose & White, Birmingham, Ala., for defendant-appellee.
 Appeal from the United States District Court for the Northern District of Alabama.
 Before KRAVITCH, Circuit Judge, GODBOLD and JOHNSON*, Senior Circuit Judges.
 JOHNSON, Senior Circuit Judge:
 
 I. STATEMENT OF THE CASE
 
 1
 A workplace accident gave rise to this product liability case brought by Dannie Lee Gean and his wife, Mary Ann.[1] At the time of the mishap, Gean was employed by Diamond Shamrock Corporation to perform maintenance work. On May 30, 1986, Gean was attempting to repair a conveyor belt manufactured by Uniroyal, Inc. and used by Diamond Shamrock to transport salt. The belt, which operated in a wet environment caused by the combination of steam and salt, had been slipping on the drive pulley manufactured by FMC Corporation. The covering on the pulley, known as "lagging," was smooth rather than grooved. In wet environments, smooth pulleys cause chronic belt slippage, whereas grooved pulleys do not. The chronic slippage associated with smooth pulleys can be ameliorated temporarily, but not cured, by applying belt dressing to the underside of the belt while the conveyor is operating. During the application of belt dressing which was manufactured by Cling Surface Company (Cling) to the belt, Gean's arm was caught in the conveyor. The conveyor pulled him a distance of approximately three to four feet to the nip point, where the belt establishes contact with the drive pulley. As a result, Gean suffered severe injuries necessitating the amputation of his arm and shoulder.
 
 
 2
 In federal district court, the Geans sued Uniroyal, FMC, and Cling, alleging various tort claims arising from the conveyor accident. The claims against Uniroyal were dismissed, and the case went to trial with two defendants, FMC and Cling. The Geans' sole claim against FMC at trial proceeded under a failure-to-warn theory. After an eleven-day trial, the jury found Cling and FMC jointly liable for $4 million in compensatory damages. The jury also found Cling liable for $1 million in punitive damages.
 
 
 3
 After the district court entered judgment on the verdict, both defendants moved for judgment notwithstanding the verdict (JNOV) and, in the alternative, a new trial. The district court granted Cling's motion for JNOV, but only as to the punitive damages. In the same order, the district court granted JNOV for FMC because the Geans had failed to establish both a duty to warn and proximate cause, but also granted an unconditional new trial to the Geans against FMC on a new theory--negligent design. The Geans had discovered and asserted the factual grounds for this theory late in the pretrial stage, and the district court had prohibited the theory from being asserted at trial. In its order granting JNOV and the new trial, the district court explained that it had prohibited the negligent-design theory for judicial economy and timeliness reasons, but that hindsight showed that negligent design was the Geans' only viable theory and, therefore, fairness dictated a new trial.[2] After the Geans amended their complaint to allege the negligent-design theory, FMC successfully moved for summary judgment.
 
 
 4
 On appeal, the Geans argue that the district court erred in granting FMC's motion for JNOV on the failure-to-warn claim and its motion for summary judgment on the negligent-design claim.
 
 II. ANALYSIS
 
 5
 This Court reviews JNOV orders de novo. Finch v. City of Vernon, 877 F.2d 1497, 1502 (11th Cir.1989). We " 'consider all of the evidence ... with all reasonable inferences most favorable to the [Geans]. If the facts and inferences point so strongly and overwhelmingly in favor of [FMC] that the Court believes that reasonable men could not arrive at a contrary verdict, granting of the motion is proper. On the other hand, if there is substantial evidence opposed to the motion ... the motion[ ] should be denied.' " Id. at 1501-02 (quoting Boeing Co. v. Shipman, 411 F.2d 365, 374 (5th Cir.1969) (en banc)).
 
 
 6
 The district court granted JNOV because it found that the Geans failed to present substantial evidence of a duty to warn and proximate cause. The Geans contend that the district court erred in both findings. FMC, however, argues that the district court's findings were correct and further argues that JNOV was proper on its affirmative defense of assumption of risk.[3]
 
 A. Duty to Warn
 
 7
 Under the Alabama Extended Manufacturers Liability Doctrine ("AEMLD"), the plaintiff must prove that the product was defective. Entrekin v. Atlantic Richfield Co., 519 So.2d 447, 449 (Ala.1987). A product is defective if it is marketed without a warning and is unreasonably dangerous when used as intended, unless the danger is open and obvious or known by the plaintiff. Id. See Casrell v. Altec Indus., 335 So.2d 128, 132-33 (Ala.1976). The issue of defectiveness is usually one of fact and thus normally for the jury. Outlaw v. Firestone Tire & Rubber Co., 770 F.2d 1012, 1014 (11th Cir.1985) (reversed directed verdict "largely" because of one expert's testimony, this Court reversed directed verdict). See Entrekin, 519 So.2d at 449; Casrell, 335 So.2d at 133. The Geans argue that the district court erred by holding that a reasonable jury could not conclude that FMC had a duty to warn Diamond Shamrock that smooth-lagged pulleys cause belt slippage when used in wet environments and that a grooved-lagged pulley is more appropriate in wet environments. We agree.
 
 1. Intended Use
 
 8
 A jury could reasonably conclude that an intended use of the smooth pulley was as a drive pulley in a wet environment. A use is "intended" if it is one that the manufacturer could reasonably foresee. See Dunn v. Wixom Bros., 493 So.2d 1356, 1360 (Ala.1986) (approving jury instruction including such language). Dr. Douglas Muster gave expert testimony that, not only it is known in FMC's industry that salt water is a common lubricant for conveyors, but that it was logical that the smooth pulley would be used as a drive pulley in a wet environment absent any warning about such misuse. Moreover, Mr. Philip Luman, an employee of the company that ordered the pulley from FMC for Diamond Shamrock, testified that the smooth pulley could be used in many ways, including as a drive pulley. Furthermore, FMC's predecessor company participated in drafting a Conveyor Equipment Manufacturers Association Handbook that advocated the use of grooved, rather than smooth, pulleys in wet environments, which permits the reasonable inference that FMC's predecessor was aware that smooth pulleys might be used in wet environments.
 
 2. Unreasonable Danger
 
 9
 A reasonable jury could conclude that use of the smooth pulley in a wet environment is unreasonably dangerous. Dr. Muster testified that using a smooth pulley in a wet environment always leads to chronic slippage which cannot be corrected by routine maintenance, but may be temporarily addressed by application of belt dressing. Dr. Kenneth Laughery gave expert testimony that the activity that Gean was performing at the time of the accident was extremely hazardous. Further, the instructions that FMC sent with the pulley stated that maintenance on moving conveyors could cause injury, and a publication by the American National Standards Institute (ANSI) stated that maintenance generally should not be performed on moving conveyors. Finally, FMC's counsel brought out on cross-examination Gean's testimony that the nip point was one of the most dangerous areas on the conveyor and more importantly that, in retrospect, the application of bar belt dressing was "terribly dangerous."
 
 3. Lack of Knowledge of Danger
 
 10
 A reasonable jury could conclude that Gean was unaware of the danger posed and that such danger was not open and obvious. Gean himself testified that he was unaware of the danger of being pulled to the nip point from where he stood, three to four feet away. See, Entrekin, 519 So.2d at 450. Further, Dr. Laughery testified that Gean could not have understood the biomechanical forces created by the belt in question. Therefore, JNOV was not warranted on the defect element of AEMLD liability.[4]
 
 B. Proximate Causation
 
 11
 With regard to proximate causation, the Geans bore the burden of proving that: (1) Diamond Shamrock would have read the warning and bought a grooved pulley instead of the smooth one involved in the accident, and Gean's injuries would thereby have been avoided, Gurley v. American Honda Motor Co., 505 So.2d 358, 361 (Ala.1987), (2) the failure to warn was not merely a "remote" cause, i.e., there was no intervening and independent cause, City of Mobile v. Havard, 289 Ala. 532, 268 So.2d 805, 810 (1972), and (3) Gean's injury was a reasonably foreseeable result of the failure to warn, Graham v. Wal-Mart Stores, 529 So.2d 938, 939 (Ala.1988).
 
 1. Read and Heed
 
 12
 Regarding the first requirement, Mr. Dennis Weber, the maintenance superintendent at Diamond Shamrock at the time of the accident, testified that he would have obeyed an instruction about the correct application of the smooth pulley. Mr. Weber also gave testimony from which a reasonable juror could infer that the smooth pulley would not have been purchased if Weber had been warned that more than routine maintenance would be required to keep it working properly. Moreover, the expert testimony given by both Dr. Muster and Dr. Laughery supported the reasonable inference that, had a grooved pulley been used, Gean's injuries would have been averted.
 
 2. No Intervening, Independent Cause
 
 13
 Concerning the second element, although Gean's application of the belt dressing may constitute an intervening cause, there was significant evidence that it was not an independent cause. It is uncontroverted that the application of belt dressing was caused by the chronic slippage brought about by the use of the smooth pulley in the wet environment and that, prior to the chronic slippage, belt dressing had never been applied to the conveyor belt. From this evidence and the evidence supporting the reasonable inference that the failure to warn caused the chronic slippage, see supra Part II.B.1., the jury could reasonably have concluded that, but for the failure to warn, Gean would not have used belt dressing on the conveyor. Such a conclusion is tantamount to a finding that the belt dressing was not an independent cause of Gean's misfortune. See Havard, 268 So.2d at 810.
 
 3. Reasonably Foreseeable Result
 
 14
 With regard to the final requirement, there was substantial evidence that an accident like Gean's was a reasonably foreseeable result of failing to warn of chronic slippage resulting from misuse of the smooth pulley. Dr. Muster testified directly to this issue, stating that, from FMC's point of view, Gean's injuries were the logical result of its failure to warn. Further, as we have already recounted there was substantial evidence regarding the foreseeability of applying bar belt dressing to a moving belt to address the chronic slippage caused by foreseeable misuse and the extremely hazardous nature of that activity. Hence, JNOV was not proper on proximate cause grounds.
 
 C. Assumption of Risk
 
 15
 Assumption of risk is an accepted defense to liability under the AEMLD. Dennis v. American Honda Motor Co., 585 So.2d 1336, 1342 (Ala.1991). In order to establish assumption of risk, the defendant must prove that the plaintiff understood the danger involved. Slade v. City of Montgomery, 577 So.2d 887, 892 (Ala.1991). The JNOV order cannot be justified on this ground because, as already shown, there was substantial evidence that Gean failed to appreciate, and was incapable of appreciating, the danger involved. See supra, Part II.A.3.
 
 
 16
 For the foregoing reasons, the district court's order granting JNOV to FMC must be reversed. Furthermore, because the district court's unconditional award of a new trial to the Geans depended squarely on the correctness of its disposition of the JNOV issue, the new trial order is also due to be reversed.[5] Finally, we decline to reach the issue of the propriety of the summary judgment order because our reversal of the new trial order renders the summary judgment issue moot.
 
 III. CONCLUSION
 
 17
 We REVERSE the district court's order granting FMC's motion for JNOV and awarding the Geans an unconditional new trial, and REMAND with instructions to reinstate the judgment on the verdict. See Wilson v. S & L Acquisition Co., 940 F.2d 1429, 1441 (11th Cir.1991).
 
 GODBOLD, Senior Circuit Judge, dissenting:
 
 18
 The "unreasonable danger" sued on in this case is that of using the smooth pulley in a wet environment where a belt might slip. The opinion of this court recognizes this in Part II.A.1. I agree that, with the "dangerous use" thus properly defined, the proof met the requirements of the Alabama Extended Manufacturers Liability Doctrine for defectiveness. The jury could conclude that plaintiff was unaware of the defect sued on--the "wet environment" danger--and could find that such danger was not open and obvious.[1]
 
 
 19
 Once it is recognized that the defect on which liability is based is failure of the equipment in a wet environment, plaintiff's case fails because the proof shows no relationship of proximate cause between FMC's conduct and plaintiff's injury and because plaintiff by his conduct assumed the risk. Plaintiff testified that he positioned himself three or four feet from the "nip point," the point at which the belt, moving toward the drive pulley, met the rotating drum of the pulley. According to his testimony, he applied belt dressing to the under side of the moving belt by holding in his hand a stick of the dressing and pressing it against the belt.[2] As plaintiff explained it, the dressing would not separate, or change from its stick form, until held against the moving belt; friction and the build up of heat then would cause the hard, granular material of the stick to become sticky and tar-like and to adhere to the belt, which carried it to the drum to which some of it would adhere.[3]
 
 
 20
 In testimony that the jury was entitled to accept, plaintiff explained that it was not feasible for him to stand further away than three or four feet from the point at which belt and pulley met each other, the "nip point." The belt passed over a series of non-powered rollers before reaching plaintiff's position. He stood between the pulley and the roller nearest to it. He could not stand further away from the pulley because he then would be over dangerous tanks located below the moving belt. There was conflicting evidence of whether it would have been effective to apply the belt dressing to the belt as it left the drive pulley. The jury was entitled to accept plaintiff's testimony that this would not have been effective.
 
 
 21
 Accepting plaintiff's description of the circumstances of his actions, they were actions too remote for plaintiff's injuries to be proximately caused by FMC's failure to warn of the dangers of using the pulley in a wet environment. A manufacturer of a product that is dangerous when used under wet conditions must reasonably foresee that the user will attempt in some manner to ameliorate or cure the dangerous condition. But the manufacturer need only foresee curative efforts that are reasonably related to a curative end. The manufacturer need not foresee that the dissatisfied purchaser of a defective watch will attempt to fix it with a sledgehammer. Moreover it is bound to foresee only curative effort that is conducted with reasonable care. An auto tire might be found defective because marketed without a warning that it should not be inflated beyond 50 pounds. The manufacturer would be bound to foresee the possibility that if the tire is over-inflated and blows out the user must jack up the wheel to remove the tire. But it is not required to foresee that the user, in using the jack, will negligently injure his hand by placing it between the lifting face of the jack and the automobile axle. That is not the defect sued on.
 
 
 22
 Plaintiff's actions were not foreseeable to FMC for several reasons: (1) they violated the practices and standards of the industry; (2) they were openly and obviously dangerous; (3) plaintiff himself recognized the open and obvious dangers of his actions; (4) alternative measures were available to cure the slipping pulley.
 
 
 23
 (1) Practices and standards of the industry: These bear on actions that FMC, a member of the industry, could reasonably anticipate users might take to cure the defect. FMC sent to the equipment dealer that ordered the pulley for Diamond Shamrock written operating instructions stating that maintenance on moving conveyors would cause injury. The dealer sent these on to Diamond Shamrock, where they were filed in an open file of similar materials available to, and used by, employees concerning questions about equipment usage. Also, a generally available publication of the American National Standards Institute states that maintenance generally should not be performed on moving conveyors. There is no evidence that plaintiff saw the FMC instructions or the ANSI publication.
 
 
 24
 The stick of Cling belt dressing is encased in a coated paper tube approximately nine inches tall and two inches in diameter. The tube bears on its exterior this warning:
 
 WARNING
 
 25
 All belts must be stopped when applying belt dressing. Do not apply to a moving belt for you may suffer serious bodily injury by being caught in moving machinery. Be sure to use material on belts only. Do not apply to sheaves or pulleys. Do not apply to moving belts.
 
 
 26
 Plaintiff denied seeing this warning. Cling's brochure, describing its belt dressings and distributed to the trade says:
 
 CAUTION
 
 27
 Apply dressing ONLY WHEN BELTS ARE STOPPED.
 
 
 28
 Its more complete brochure, describing its full line of products, says with respect to its belt dressings:
 
 
 29
 Do not apply to a moving belt.
 
 
 30
 At the time of the accident Diamond Shamrock had in effect written procedures concerning working on moving equipment. "Safety tagging" procedures applied to "whatever work is to be performed on any operating and/or electrical equipment." They required that safety tags be installed on the safety switch or starter of the equipment. Additionally, when work was to be done on electrical equipment, a safety lock was to be placed on the switch or starter. The procedures stated their purpose: "to offer protection to employees working on any equipment in the plant by indicating when such equipment should not be started up, energized or activated." These procedures demonstrate standards of the industry that FMC could anticipate would be employed by a user.[4]
 
 
 31
 The subjective explanations by plaintiff that I have set out in text and footnote, describing what he knew and his state of mind, do not diminish the probative force of the FMC warning, the warning on the label, the published industrial standards, and the Diamond Shamrock standards, as objective exemplars that under industry standards the actions taken by plaintiff were not actions that the manufacturer should anticipate. Additional strength is given to the label warning as an industry standard by the plaintiff's testimony that if he had read the warning on the label he would not have applied the belt dressing to the moving belt but would have stopped the machinery from operating and would not have utilized belt dressing at all.
 
 
 32
 (2) Obvious and open dangers: The Alabama Supreme Court recognizes that "openness" and "obviousness" are part of the inquiry into proximate causation. Entrekin v. Atlantic Richfield Co., 519 So.2d 447, n. 5 (Ala.1987). In determining whether a danger is open and obvious it is relevant to examine whether it would be commonly known that the condition was dangerous. Ford Motor Co. v. Rodgers, 337 So.2d 736, 740 (Ala.1976). A child of grade school age knows not to touch, handle, or even come in close proximity to a moving pulley and belt on heavy machinery, especially at a point close to the pulley toward which the belt is moving. Extending the inquiry to include the facts in this case, a reasonable person of maturity would be aware of the risks of applying hard granular material to a moving belt by holding the material in his hand and pressing it against the belt, a foot or two from the juncture of belt and pulley. The plaintiff in this case, like the plaintiff in Entrekin, "had reached the age of discretion and was in possession of his mental faculties." 519 So.2d at 450.
 
 
 33
 (3) Plaintiff's knowledge of open and obvious dangers: Beyond principles of common sense and general knowledge known to everybody, we know that plaintiff himself recognized the open and obvious danger of what he was doing. Plaintiff was trained and experienced in his work. He had been rated for six to eight years as First Class Maintenance Man, based on work, correspondence study, on the job training and performance. He had worked on the conveyor system for many years. In his testimony, on direct and cross-examination, plaintiff repeatedly acknowledged his awareness of the dangers of where he was positioned in close proximity to the nip point and what he was doing. A few excerpts from the record reveal this testimony.
 
 
 34
 Q. Now, as far as the nip--or danger--point, you, of course, fully appreciated before you ever went up there that that was a place of danger; right?
 
 
 35
 A. Yes, sir. At every row there is a nip point, there is a nip point every four foot.
 
 
 36
 Q. Yes, sir. But the rollers--The belt goes over the rollers; the belt comes out on the other side. But when the belt goes over this drive pulley, it goes around; right?
 
 
 37
 A. Yes, sir. But if you get your arm in that nip point, the belt is going to keep going and you are not going to be able to pull it out, and you're going to be in trouble.
 
 
 38
 Q. And your hand, if it got caught in this nip point as it went over the drive pulley, obviously, you recognize that as a very dangerous place and a place where you needed to be very careful to keep your hand out of it; right?
 
 
 39
 A. Yes, sir.
 
 
 40
 Q. Now, of course, the fact that that is a place of danger and a place to exercise extreme care is not a matter you needed to be warned about at the time of the accident; right? That is to say, the place where the top of the conveyor belt meets and goes over the drive pulley?
 
 
 41
 A. No, sir.
 
 
 42
 Q. Sir?
 
 
 43
 A. No, sir, I did not need to be warned.
 
 
 44
 Q. Now--
 
 
 45
 A. Not that I would object to anyone warning me, you know. I knew the belt was running, but I knew the point was there.
 
 
 46
 Q. And you knew it was a place of danger that you needed to avoid?
 
 
 47
 A. Yes, sir, I knew that.
 
 
 48
 Q. Because if you didn't avoid it and you got caught in it, you knew that you could get seriously injured; right?
 
 
 49
 A. Yes, sir, I knew that.
 
 
 50
 Tr. 268-69.
 
 
 51
 Q. But you didn't put the bar belt [dressing] on the pulley because you felt that would have been a very dangerous thing to do, didn't you?A. Yes, sir.
 
 
 52
 Q. And it would likewise would be dangerous to get your hand anywhere near the nip, or the danger, point where the top of the belt goes over the pulley; right?
 
 
 53
 A. Yes, sir.
 
 
 54
 Tr. 280-81.
 
 
 55
 After questions relating to where plaintiff positioned himself, this ensued:
 
 
 56
 Q. Mr. McWhorter [counsel for FMC] asked you did you appreciate the danger, did you recognize the great possibility of danger, and I believe you said yes; is that right?
 
 
 57
 A. Yes.
 
 
 58
 Tr. 367.
 
 
 59
 After a series of questions inquiring whether, as the stick of belt dressing material became smaller from being applied to the belt, plaintiff would become more concerned because of the possibility of his hand being brought by the motion of the belt into the nip point, the following ensued:
 
 
 60
 Q. And you had attempted to use more care because you appreciated the shorter it [the stick] was and the quicker you could be moved inward to the danger point?
 
 
 61
 A. I didn't say that, no, sir.
 
 
 62
 Q. Well, let me ask you this: You just feel that when you are that close and there contacting the underside of the belt as it moves toward the nip point, that when you are that close, it's a terribly dangerous situation anyway; right?
 
 
 63
 A. Yes.
 
 
 64
 Tr. 287-88.
 
 
 65
 * * * * * *
 
 
 66
 Q. [Reading from plaintiff's deposition] "And in that situation did you attempt to use anymore care since it [the stick] was shorter and therefore if it moved inward it would get your hand in quicker?" And did you answer, "Yes, that would be reasonable, yes"?
 
 
 67
 [Colloquy between counsel.]
 
 
 68
 Q. Do you recall testifying that way, as well as you remember?
 
 
 69
 A. Well, you know, I'm sure they wrote it down right.
 
 
 70
 Tr. 288-89.
 
 
 71
 Q. And as you saw that [i.e., when applying the dressing and observing that the belt was travelling toward the drive pulley], you, of course, appreciated the great possibility as you were applying the bar belt dressing, of the top of the belt moving your hand close to the nip, or danger point?
 
 
 72
 A. Yes, sir.
 
 Tr. 293
 
 73
 Plaintiff's co-worker, James Spain, was positioned on the opposite side of the belt from plaintiff but perhaps a foot further away from the pulley. He recognized the open danger.
 
 
 74
 Q. And you could see danger and you knew there was a clear danger presented by this pulley and the belt going over the pulley right there at that nip point?
 
 
 75
 A. Let's hear your question again.
 
 
 76
 Q. Okay. You knew that this was a place of great danger, the place where the belt meets the drive pulley; right?
 
 
 77
 A. Yes, sir. I say it would be dangerous.
 
 
 78
 Tr. 1567.
 
 
 79
 In the light of this testimony I do not understand the statement in the opinion of this court (Mss. p. 7) that plaintiff testified that he was "unaware of the danger of being pulled to the nip point from where he stood."[5]
 
 
 80
 (4) Available alternative means: It is obvious that if there were only one way to cure or ameliorate a defect the manufacturer would be bound to anticipate that this method might be employed. This is not such a case.
 
 
 81
 The most telling evidence of alternative means is that when plaintiff and his co-worker Spain set about to try to stop the belt from slipping they obtained from a co-worker two items, a spray can of a product made by the same manufacturer and sold for the same purpose, and the material in stick form. The belt dressing could be sprayed from the spray can without the user's coming in contact with, or in immediate proximity to, the moving machinery. The can was only partially filled, and it was exhausted by Spain's spraying it on the pulley itself. Spain then tried the stick dressing "up the line," but he "wasn't having any luck with it," and plaintiff took it from him and began using it. Plaintiff made no effort to obtain more dressing in spray can form.[6] Plaintiff made the choice to use the stick form although he had never before seen it used on this conveyor system, or used at all except on belts for small machinery on his farm and at the plant. In short, a safer method was available, but plaintiff did not pursue it. Also, it is obvious that the conveyor could have been shut down while the slippage problem was addressed (whether by spray, stick or some other means). But plaintiff considered this not economically feasible. Also plaintiff testified that he thought the stick form had to be applied to a moving belt to create separation by heat and friction.[7]
 
 
 82
 Additionally, there is no evidence that the stick of dressing could be applied only when hand-held. Presumably it could be gripped with a pair of long-handled pliers or a mechanic's wrench, removing the hand from immediate proximity to the belt. Plaintiff and Spain had equipped themselves with tools before coming to the site.
 
 
 83
 In summary, I agree with the district court that plaintiff's injury was not proximately caused by the defect sued on. It was too remote. I have discussed the evidence in proximate cause/foreseeability terms. It may also be examined in terms of whether there was an independent intervening cause. A subsequent cause would not be an independent intervening cause if it were foreseeable by the manufacturer. For the same reasons I have set out, plaintiff's actions were not foreseeable by FMC; they were an independent intervening cause that broke the chain of causation.
 
 
 84
 Finally, plaintiff is barred by the affirmative defense of assumption of risk. The open and obvious danger, plaintiff's own testimony, and the testimony of Spain who was present and appreciated the danger, establish that plaintiff appreciated the danger.
 
 
 85
 It is unfortunate that this diversity case is not amenable to certification to the Supreme Court of Alabama. In Entrekin, supra, the issue was defectiveness. The Alabama Supreme Court held that there was insufficient evidence to show that lubricating material to be applied to new gears on heavy machinery was defective because of insufficient warning against applying it to exposed, moving gears. A plastic packet of the material could be dropped into the exposed and moving gears where the packet would be ground up, or opened and squeezed onto the gears, or squeezed into a bucket and poured on the gears. Plaintiff used the second method. He reached too close to the moving gears, and the plastic packet became entangled and drew his hands into the "nip point" created by two gears. The court held:
 
 
 86
 The use of certain products is so firmly grounded in common sense as to require no specific instruction or warnings. The defendant's failure to warn the plaintiff in this case of the open and obvious danger of lubricating the exposed, moving gears of a crane, did not render the product defective. A warning is to inform the user of a danger of which he is not aware.
 
 
 87
 519 So.2d at 450. This is the plaintiff of whom the court said, "The plaintiff had reached the age of discretion and was in possession of his mental faculties." The court held, furthermore, that plaintiff had the option of shutting the machinery down or using the alternative means of applying the material, none of which were unreasonably dangerous. The ultimate question arising from these facts was defectiveness. Here the issue is the limits of proximate cause. But both cases address the openness and obviousness of dangers presented by remarkably similar facts. And both implicate alternative means that would avoid the dangers. One reading Entrekin can confidently predict that the state court would promptly--and correctly--affirm the district judge in the case before us. In this state-law diversity case we should listen to what the Alabama Supreme Court tells us.
 
 
 88
 I would affirm the judgment n.o.v. There is no need for me to address other issues.
 
 
 
 *
 See Rule 34-2(b), Rules of the U.S. Court of Appeals for the Eleventh Circuit
 
 
 [1]
 References in this opinion to "Gean" apply solely to Mr. Gean
 
 
 [2]
 Pending Cling's appeal, the Geans and Cling entered into a pro tanto release for $3.3 million
 
 
 [3]
 FMC also argues that JNOV was proper on a fourth ground, contributory negligence. However, all of the authority that FMC cites in support of its contributory negligence argument addresses only assumption of risk which, under Alabama law, is a subspecie of contributory negligence. See Cooper v. Bishop Freeman Co., 495 So.2d 559, 563 (Ala.1986). Therefore, we address only the assumption-of-risk argument
 
 
 [4]
 FMC also argues that, even if it had a duty to warn, it discharged that duty by issuing instructions that informed Diamond Shamrock not to service the pulley while the conveyor is moving. Such instructions, however, are irrelevant to the Geans' theory that there should have been a warning about misuse of the smooth pulley in a wet environment and the attendant, chronic belt slippage. Moreover, even if FMC's instructions were relevant, in the words of Dr. Muster, they were "platitudinous" because certain maintenance procedures, including applying belt dressing to the Diamond Shamrock conveyor, required the conveyor to be moving
 
 
 [5]
 The new trial was ordered because the district court concluded that negligent design was the Geans' only viable theory. Because we find that the failure-to-warn theory was also viable, the asserted ground for awarding a new trial no longer exists
 
 
 [1]
 While I agree with the conclusion concerning defectiveness I do not agree with the reasoning. As footnote 4 points out, the dangerous use sued on is use of the smooth pulley in a wet environment, not the danger of applying belt dressing to a moving pulley. In Part III.A.3, however, in examining whether plaintiff lacked knowledge of danger and of whether the danger was open and obvious, the court looks at the dangers of applying belt dressing
 
 
 [2]
 There was evidence that the plaintiff was applying dressing to the pulley itself, but the jury could accept his version
 
 
 [3]
 As explained below, holding the stick against a moving belt is precisely the manner of application that the warning on the label and in Cling's publications to the trade say is not to be employed
 
 
 [4]
 Plaintiff did not lock out or safety tag the conveyor switch, since he did not stop the conveyor at all. He considered that stopping the belt and locking the switch was not applicable because he was working on the belt, not the electric motor. He justified his failure to turn off the power and tag the switch by a contention that the procedures cover only "repairs" and that he was performing "maintenance." The heading for the safety tagging procedures is in terms of "working on any equipment" and of "whatever work is to be performed," but the body refers to "repair[ing] a piece of equipment" and to "the Maintenance repair crew." Plaintiff relied on this arguable ambiguity. Yet he acknowledged that he and Spain "went up there to see what the problem was, yes, and see if he could fix it," and "to do something about it," Tr. 251, "to find out the problem that's causing the slipping and stop that, whatever it took," Tr. 252. Moreover, he acknowledged that the safety tag and lock-out procedures were "designed to keep people from getting hurt when they are working on moving equipment." Tr. 251. And the lock-out procedure was intended to "keep people who are working on it [equipment] not to get hurt whether they are repairing it or maintaining it." Tr. 249. Plaintiff himself had used the lock-out procedure while working on this very conveyor system and its electric motor
 Also, see opinion of this court, stating that plaintiff was "attempting to repair" the belt.
 
 
 [5]
 The testimony of plaintiff's expert, Dr. Laughery, a professor of engineering psychology, does not diminish the impact of plaintiff's own testimony describing his actual awareness of the open and obvious dangers. Laughery's testimony was primarily directed to the design and adequacy of the label on the belt dressing, an issue in plaintiff's claim against Cling. Plaintiff had not read the label. In discussing the adequacy of the label as a warning Laughery described a possible combination of "biomechanical forces" and fatigue that might cause plaintiff's arm to be pulled into the nip point. But Laughery could not--and did not--describe plaintiff's actual knowledge and appreciation of the risks in what he was doing. Moreover, plaintiff himself, in his testimony set out above, had repeatedly described his actual knowledge
 
 
 [6]
 The belt dressing is also available in large cans to be pumped or poured on. The stick form constitutes approximately 13% of the company's sales of belt dressing
 
 
 [7]
 Why he would have thought this, if he did, has not been explained. He had never seen a Cling stick used on this belt or any other belts except small ones. The manufacturer by its label says this is the way not to apply it. It would be peculiar indeed if the only way to use a product would be in the very manner that the manufacturer says it must not be used